UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TRACY S. WINHOVEN,

              Plaintiff,                      Civil Action No. 5:12-12426

        v.                          District Judge John Corbett O'Meara
                                          Magistrate Judge Laurie J. Michelson

COMMISSIONER OF
SOCIAL SECURITY,

              Defendant.
_____/

**REPORT AND RECOMMENDATION TO
GRANT IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [12] AND
DENY DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [15]**

Following two lower-back surgeries, Plaintiff Tracy Winhoven returned to work for about a year. In December 2008, however, while attempting to lift some boxes, she hurt her back. An MRI revealed "a large recurrence of . . . disk herniation." This warranted a third surgery, which included an L5-S1 fusion. Despite this procedure, and continued pain medication, Plaintiff maintains that her back pain, along with her depression, prevents her from working full time. Accordingly, she has applied for Social Security disability insurance benefits and supplemental security income. An Administrative Law Judge acting on behalf of Defendant Commissioner of Social Security denied these applications. Plaintiff now appeals to this Court. (Dkt. 1, Compl.) Before the Court for a report and recommendation (Dkt. 3) are the parties' cross-motions for summary judgment (Dkts. 12, 15). Having reviewed the briefs and the administrative record, this Court believes that the ALJ did not adequately articulate her credibility analysis or consider all the relevant factors bearing on Plaintiff's credibility. As such, and for reasons set forth below, the Court RECOMMENDS that Plaintiff's

Motion for Summary Judgment (Dkt. 12) be GRANTED IN PART, that Defendant's Motion for Summary Judgment (Dkt. 15) be DENIED, and that, pursuant to 42 U.S.C. § 405(g), the decision of the Commissioner of Social Security be REMANDED.

## I. BACKGROUND

### A. Procedural History

In January 2009, Plaintiff applied for disability insurance benefits and supplemental security income asserting that she became unable to work on December 7, 2008. (Tr. 20.) The Commissioner initially denied these applications in June 2009. (*Id.*) Plaintiff then requested an administrative hearing, and in June 2010, she testified about her impairments before Administrative Law Judge Oksana Xenos. (*See id.* at 35-51.) In an August 17, 2010 decision, ALJ Xenos found that Plaintiff was not disabled within the meaning of the Social Security Act. (*See* Tr. 20-28.) Her decision became the final decision of the Commissioner on April 10, 2012, when the Social Security Administration's Appeals Council denied Plaintiff's request for further administrative review. (Tr. 1.) Plaintiff filed this suit in June 2012. (Dkt. 1, Compl.)

### B. Medical Evidence

#### 1. Back Pain Treatment Before the Alleged Onset Date

In early 2004, Plaintiff began suffering from right-side sciatic pain. (Tr. 226.) An MRI revealed a "large" ruptured lumbosacral disc. (Tr. 227.) The first of ultimately three spine surgeries followed: in September 2004, at 33 years old, Plaintiff underwent an L5-S1 microdiscectomy (a procedure to remove herniated disc material pressing on a nerve root or the spinal cord). (Tr. 228-29.)

The surgery did not resolve Plaintiff's condition. (*See* Tr. 418.) In October 2005, an MRI

2

revealed a bulging disc at L4-L5 and a disc protrusion and neuroforamina encroachment and impingement of the nerve root(s) at L5-S1. (Tr. 422.)[1]

In February 2006, Plaintiff saw Dr. Lesly Pompy (Tr. 418), apparently an interventional pain management specialist (Pl.'s Mot. Summ. J. at 2). Plaintiff reported "right radicular [pain] back to hips and thighs and heels, 10/10 intensity, burning sharp, squeezing, shooting[] pain of chronic duration with recent exacerbation." (Tr. 418.) It appears that Dr. Pompy provided an epidural steroid injection: a week later, Plaintiff returned to Dr. Pompy to report that the relief from a "procedure" had "wor[n] off." (*See* Tr. 415.) His plan was a caudal epidurogram, epidural steroids, and an "awake discography of L5-S1." (Tr. 417.) He also prescribed Methadone. (Tr. 417.) In late February 2006, Plaintiff told Dr. Pompy that Methadone had not relieved her pain and that she had no insurance for pain-block procedures. (Tr. 413.) His updated plan: "Patient to be off work until she is able to have Percutaneous discectomy procedure. Oxycontin 10 mg. & Methadone 10 [twice a day] prescribed." (Tr. 414.)

Although there are no further office-visit notes from 2006 in the record, it is plain that Plaintiff continued to suffer from back problems during that time. In May 2006, Plaintiff underwent a second surgery, a discectomy. (Tr. 443.) In August 2006, a CT scan of Plaintiff's lumbar spine revealed "[p]ostoperative changes at L5-S1 with granulation tissue surrounding right S1 nerve root"

---

[1]The spinal column is comprised of vertebrae separated by discs that act as cushions between the vertebrae. The *central canal* of the spinal column conveys the spinal cord. At each disc level, e.g., C6-C7, a pair of spinal nerves exit the canal via *neural foramen* and thereby pass into the arms or legs. Joseph T. Alexander, M.D., Assistant Professor of Neurosurgery for Mayo Medical School, Lumbar Spinal Stenosis: Diagnosis and Treatment Options (June 1999); The Cleveland Clinic, Lumbar Canal Stenosis, http://my.clevelandclinic.org/disorders/stenosis_spinal/hic_lumbar_canal_stenosis.aspx (visited May 22, 2012); Randy Shelerud, Mayo Clinic Physical Medicine Specialist, Herniated Disk, http://www.mayoclinic.com/health/ bulging-disk/AN00272 (visited May 23, 2012).

and, at L4-L5, "[p]ersistent facet degenerative change, disc bulge and small annular tear." (Tr. 460.)

Following the August 2006 study, there is another gap in the administrative record, with the next treatment note corresponding to Plaintiff's March 2007 visit with Dr. Anita Craig, a physician in the University of Michigan's Physical Medicine and Rehabilitation Spine Clinic. (Tr. 186; Pl.'s Mot. Summ. J. at 4.) Plaintiff had finished physical therapy and reported some improvement in her pain. (Tr. 186.) Dr. Craig noted that injection therapy had not been helpful, however, and that Plaintiff would continue to have "some chronic radicular symptoms due to the granulation tissue." (*Id.*) Because Plaintiff had to drive far to see Dr. Craig, Dr. Craig encouraged Plaintiff to follow up with her primary-care physician in the future. (*Id.*)

It appears that Plaintiff's back condition improved for a time: from December 2007 to December 2008 she worked full time as a cashier in a thrift shop. (Tr. 132.)

### 2. Back Pain Treatment After the Alleged Onset Date

Unfortunately, in December 2008, Plaintiff attempted to lift some boxes at work and felt a pull in her lower back on the right side. (Tr. 187.) She soon developed numbness and pain in her right leg. (*Id.*) Plaintiff explained to Dr. U. Satya Rao, a physician at her primary-care facility, that her pain felt "very similar" to when she had her first back surgery. (Tr. 192.) Dr. Rao noted, "She states she is currently unable to work because she has to not only take care of her newborn but she is unable to bend or lift any heavy objects. She is wondering if she can get some time off of work." (Tr. 192.) Dr. Rao referred Plaintiff to Dr. Paul Park, a neurosurgeon, and ordered another MRI. (*See* Tr. 181-82, 187-88.)

Dr. Park thought that the new MRI showed "a large recurrence of her disk herniation." (Tr. 187, 223.) As this was the third time Plaintiff had herniated her L5-S1 disc, Dr. Park recommended

a lumbar fusion. (Tr. 188.)

So, in February 2009, Plaintiff underwent her third surgery: release of epidural scar, redo hemilaminectomy, right L5-S1 facetectomy, foraminotomy, resection of recurrent disc herniation, L5-S1 fusion, and placement of "interbody cage at L5-S1." (Tr. 213.) (Dr. Park would later describe the procedure as "minimally invasive." (Tr. 364.)) A CT immediately following surgery not only revealed the disc spacer at L5-S1 but also "[m]ultiple disc bulges" at L2-L3, L3-L4, and L4-L5. (Tr. 463.)

At a March 2009 follow-up exam with Dr. Park, Plaintiff reported that while her "initial right-sided leg symptoms" had decreased, she was having "more pain along the posterolateral side that goes to her ankle and wraps forward." (Tr. 364.) Plaintiff also told Dr. Park that her back pain was decreasing, but qualified that she was still on high doses of Oxycontin and Oxycondone. (Tr. 364.) On exam, Plaintiff had almost full strength in her lower extremities. (*Id.*) Dr. Park prescribed physical therapy, massage, myofascial release, and aquatherapy. (*Id.*) Plaintiff's Oxycontin and Percocet prescriptions were refilled, and she started Neurontin. (*Id.*)

In April 2009, Dr. Laura Rosch reviewed Plaintiff's medical file and completed a residual functional capacity assessment for Michigan's Disability Determination Service (a state agency that helps the Social Security Administration evaluate disability claimants in Michigan). (Tr. 236-43.) Dr. Rosch opined that Plaintiff could stand or walk in combination for two hours in an eight-hour workday, sit for about six hours in an eight-hour workday, lift 10 pounds frequently, and 20 pounds occasionally. (Tr. 237.)

Plaintiff next saw Dr. Park in June 2009. (Tr. 362-63.) She reported having difficulty with most of her activities, and being unable to walk more than a half-hour or sit for more than 45

minutes. (Tr. 362.) Plaintiff felt depressed and very frustrated because of her pain. (*Id.*) She expressed having a hard time taking care of her newborn baby and her desire to be more active with him. (*Id.*) Dr. Park noted, "She was unable to undergo physical therapy because Medicaid will not pay for the therapy . . . ." (*Id.*) On exam, Plaintiff walked slowly but without an ataxic gait. (*Id.*) She was able to heel- and toe-walk without difficulty. (*Id.*) Plaintiff had five-out-of-five strength in her lower extremities. (Tr. 362.) A straight-leg-raising test produced "hamstring tightness, but no radicular symptoms . . . ." (Tr. 362-63.) Dr. Park informed Plaintiff that it would be "very difficult" to recondition herself without therapy or physical activity. (Tr. 363.) The neurosurgeon added Motrin to Plaintiff's medications and referred her to Dr. Chad Brummett, a doctor in the University of Michigan's Department of Anesthesiology, Back and Pain Center. (Tr. 363, 447.)

Plaintiff saw Dr. Brummett in July 2009; he examined Plaintiff and reviewed some of her imaging studies. (Tr. 442-48.) On exam, he found that Plaintiff had full strength in her lower extremities save for only three-out-of-five strength in her right extensor hallucis longus (a muscle that extends the big toe). (Tr. 446.) Dr. Brummett modified Plaintiff's pain medications by starting Nortriptyline (a depression medication), increasing MS Contin, and decreasing Percocet. (Tr. 442-48.) Regarding follow-up: "it would best serve [T.W.] if her [primary-care physician] managed her pain medicines following our recommendations." (Tr. 447.)

Accordingly, in August 2009, Plaintiff saw Dr. Sin-Ching Chiu, her primary-care physician. (Tr. 312.) Plaintiff reported ten-out-of-ten pain without medication and seven-out-of-ten pain with it. (*Id.*) Plaintiff also told Dr. Chiu that she was using marijuana to manage her pain. (*Id.*) Dr. Chiu increased Plaintiff's MS Contin prescription. (*Id.*)

Later that month, Plaintiff went back to Dr. Brummett. (Tr. 350-52.) Plaintiff had undergone

6

a pain injection two weeks earlier, but her "pain overall ha[d] not decreased significantly since the procedure." (Tr. 350.) She reported pain at the six- or seven-out-of-ten level, which was reduced by lying down, but increased by standing, walking, bending forward, or "other activities." (*Id.*) Plaintiff again expressed frustration that she was unable to play with her son. (*Id.*) Dr. Brummett noted, "the patient is in some mild discomfort and at times was tearful during the interview." (*Id.*) With Dr. Brummett's encouragement, Plaintiff was able to heel and toe walk. (*Id.*) She had "4 out of 5 weakness" in her ability to flex and extend her right leg. (*Id.*) Dr. Brummett believed that, before exploring further treatment, it was important for Plaintiff to be seen by "pain psychology," which would help her "deal with her social stressors." (Tr. 351.) Dr. Brummett nevertheless said that Plaintiff's Neurontin should be gradually increased to as much as 2,400 mg per day if needed. (Tr. 351.)

The pain psychologist Dr. Brummett referenced was Ross Halpern, Ph.D. (*See* Tr. 359.) In September 2009, Plaintiff told Dr. Halpern that she felt that she would be in pain for the rest of her life, and that she was "hesitant about any invasive procedures." (Tr. 358.) Dr. Halpern summarized Plaintiff's report this way:

> The patient reports she might be helped for receiving documentation for her social security case. The patient is pleased being a mother and staying at home raising her newborn child. Previous psychological factors play a role on her pain symptoms. She lived in a home in which her biological father was alcoholic, abandoned the family. She had 6 stepfathers and was sexually abused by 1 stepfather between the ages of 6 and 10. . . . Her mother was in and out of psych hospitalizations, threatened suicide, and went through electroconvulsive therapy. She reports when she told her mother she was being sexually abused, [her] mother pulled her hair. The patient reports her ex-husband was physically abusive. . . .

(Tr. 358-59.) He concluded, "She most likely is emotionally and physically exhausted due to abuse and trauma and emotional abandonment as a child and she may be seeking relief from psychological

tension. . . . The patient will be referred to . . . a therapist." (*Id.*) Plaintiff would soon start treatment with therapist David Gill; his notes are recounted below in the context of summarizing Plaintiff's mental-health treatment, *see infra*, Part I.B.4.

In October 2009, Plaintiff returned for a follow-up with Dr. Park. (Tr. 344-45; *see also* Tr. 348.) She told the neurosurgeon that she was doing well save for right-leg pain and constant cramping in that leg. (Tr. 344.) On exam, Plaintiff walked with a "slight antalgic gait to the right side," but was able to heel and toe walk without difficulty. (Tr. 344.) Plaintiff's muscle strength was five-out-of-five on the right and her sensation was intact. (*Id.*) Dr. Park advised, "there does not appear to be anything further we can recommend for [her]. If she fails all conservative efforts then the dorsal column stimulator may be indicated." (Tr. 344.)

Later that month, Plaintiff returned to see her primary-care physician. (Tr. 311.) Plaintiff told Dr. Chiu that her medication helped her to "function and at least take care of her one year old." (*Id.*) "Otherwise," Dr. Chiu noted, "not much change." (*Id.*) On exam, Dr. Chiu found that Plaintiff's lower back was "tender," but that she had "no radiating pain." (Tr. 311.) He discussed with Plaintiff the importance of preventive care, "continuing to do exercise[s] to strengthen the back," and following up with "the neurosurgeon as well as pain management closely." (*Id.*)

In November 2009, February 2010, and March 2010 Plaintiff saw Dr. Chiu for something other than back pain. (Tr. 306-08.)

In April 2010, Plaintiff reported that her back pain seemed to be worse and was radiating down to her right leg "from time to time." (Tr. 305.) She was also having "problem[s] [with] activity [lasting] more than an hour." (*Id.*) Plaintiff walked with a steady gait, however, and had normal sensory and motor function in her legs. (*Id.*) Dr. Chiu told Plaintiff to contact "the neurosurgeon"

8

regarding the implantable stimulation unit. (*Id.*) The next month, Dr. Chiu wrote on a prescription pad: "Ms. [T.W.] has chronic back pain [and] require[s] pain control, procedure or medication per pain management recommendation." (Tr. 339.)

In May 2010, Plaintiff returned to Dr. Pompy, the pain-management specialist she saw in 2006. (Tr. 407-12.) Dr. Pompy observed that Plaintiff walked slowly and avoided certain movements due to pain. (Tr. 408.) Her ability to invert and evert her foot was "weak." (Tr. 411.) Plaintiff exhibited a positive straight-leg-test. (Tr. 411.) Dr. Pompy's diagnoses were "[e]xacerbation of [f]ailed laminectomy syndrome with epidural fibrosis. Exacerbation of [r]ight L4, L5, S1 radiculopathy. Exacerbation of [a]rthropathy of the right sacroiliac joint. Neuropathic pain syndrome." (Tr. 412.) He recommended a caudal epidurogram, epidural steroids, percutaneous neuroplasty, right sacroiliac joint injection, and a course of Ketamine. (*Id.*) He also referred Plaintiff to aquatherapy. (*Id.*) Although the efficacy is not reflected in the record (*see* Tr. 389-412), Plaintiff testified that the injections made her symptoms worse, and so she did not complete them (Tr. 45).

### 3. Mental Health Treatment Before the Alleged Onset Date

In April 2007, Plaintiff saw Edward Follas, a physician assistant in (primary care physician) Dr. Chiu's office. (Tr. 206.) She reported long-standing problems of reclusiveness, feeling down, and suppressed irritability. (Tr. 206.) Plaintiff mentioned childhood abuse and a recent increased stressor of having to care for her stepfather who was also suffering from serious health problems. (*Id.*) Physician assistant Follas noted that Plaintiff's history suggested bipolar disorder and that a mood-disorder questionnaire was "rather strongly positive for bipolar disease." (*Id.*) Noting Plaintiff's prior failed response to serotonin reuptake inhibitors, Follas believed that a trial of Depakote was proper. (*Id.*) Later in April, Plaintiff returned to Follas; he noted, "[she] [h]as gotten

into a mode particularly of [her] mind racing, isn't sleepy, can't get to bed until late, gets up early and of course the consequence of chronic sleep depression." (Tr. 205.) Plaintiff reported that she would begin counseling, and Follas "[s]trongly urged [her] to stay with that." (*Id.*)

In May 2007, Plaintiff had an evaluation with Dr. Jessica Bright, a psychiatrist. (Tr. 250-58.) Plaintiff reported the following symptoms: a near-constant sad, depressed mood, increased irritability, low motivation, concentration difficulties, self-isolative behavior, sleeping disturbance, racing thoughts at night, chronic fatigue, forgetfulness, crying spells, excessive worry, and "pervasive memories about her childhood molestation." (Tr. 250.) Plaintiff stated that she woke several times during the night due to nightmares related to her childhood trauma. (Tr. 250.) "[S]he has had suicidal thoughts when found out that her mother told her stepfather recently that she felt pleasure when she was sexually abused." (*Id.*) (One of Plaintiff's several stepfathers was her abuser—it is not clear if it was the stepfather Plaintiff's mother spoke to. (Tr. 291.)) Dr. Bright diagnosed post-traumatic stress disorder, panic disorder without agoraphobia, and assigned a Global Assessment Functioning score of 55. (*Id.*)[2] Dr. Bright discontinued Depakote, started Zoloft and Klonopin, and directed Plaintiff to continue weekly psychotherapy. (Tr. 258.)

At her next visit with Dr. Bright, the psychiatrist wrote: "she does experience much less intrusive thoughts of past abuse and is not quite as ruminative, although she reports that depression continues. She denies nightmares. States psychotherapy is going well." (Tr. 260.) Dr. Bright

---

[2]A GAF score is a subjective determination that represents "the clinician's judgment of the individual's overall level of functioning." American Psychiatric Assoc., *Diagnostic and Statistical Manual of Mental Disorders* ("*DSM-IV*"), 30-34 (4th ed., Text Revision 2000). A score of 51 to 60 corresponds to "moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." *DSM-IV* at 34.

believed that Plaintiff's post-traumatic stress disorder ("PTSD") symptoms had diminished, but noted, "multiple new stressors since [their] last appointment. It sounds as though she has [an] ongoing conflict with her biological mother who is her next-door neighbor." (Tr. 260.) A recent incident with Plaintiff's stepfather also led to an acute exacerbation of her PTSD. (Tr. 263.)

In July 2007 Plaintiff reported not sleeping well, but that she was not experiencing nightmares or intrusive thoughts. (Tr. 265.)

In September 2007, Plaintiff saw Dr. Bright with her then-boyfriend. (Tr. 275-76.) He reported that, for two to three days at a time, Plaintiff experienced insomnia characterized by walking the dog at 3:00 a.m., making extensive lists, and cleaning during the night. (Tr. 275.) Plaintiff rated her symptom severity at a nine on a ten-point scale. (*Id.*) Dr. Bright acknowledged that Depakote may have been helping Plaintiff more than Plaintiff realized by "putting mood symptoms in remission [and] causing PTSD symptoms to predominate [the] clinical picture at time of first presentation." (Tr. 275.) Accordingly, Dr. Bright discontinued Zoloft, continued Klonopin and Trazodone, restarted Depakote, and started Zypreza. (Tr. 279.)

At her October 2007 appointment with Dr. Bright, Plaintiff told her psychiatrist that she had called the cops on her mother, broken up with her boyfriend, and moved in with her divorced neighbor; she also said that her stepfather had been hospitalized and that she had to put her dog to sleep. (Tr. 280.) Despite all of this, Plaintiff was sleeping through the night and compliant with her therapy. (*Id.*) And she reported her symptoms as much improved. (Tr. 284.)

At her last visit with Dr. Bright in November 2007, Plaintiff reported that she had only been compliant with Klonopin and had been drinking two to three beers per night. (Tr. 285.) Dr. Bright informed Plaintiff that she should comply with the prescribed dosage and reduce her alcohol

consumption. (Tr. 289.)

Almost a year later, in October 2008, Plaintiff gave birth to her son. (Tr. 195.) Dr. Chiu (Plaintiff's primary-care physician) discussed post-partum depression with Plaintiff. (*Id.*) Plaintiff denied any depression, but did express mild anxiety. (*Id.*) Dr. Chiu started Plaintiff on a half milligram of Klonopin one or two times per day, as needed. (*Id.*) At her follow-up the next month, Plaintiff reported that the Klonopin had helped with her anxiety and that she was not experiencing any side effects. (Tr. 194.) The physician assistant in Dr. Chiu's office noted "weaning" Plaintiff from the medication. (Tr. 194.)

In April 2009, Dr. Chiu, although providing care for something other than Plaintiff's mental health, noted that Plaintiff needed to limit her use of Klonopin "as much as she [could]." (Tr. 313.)

In September 2009, as discussed above, Plaintiff saw pain psychologist Dr. Halpern.

In late-November or December 2009 (*compare* Tr. 291, *with* Tr. 308), Plaintiff started treatment with David Gill, a limited licensed psychologist.

### 4. Mental Health Treatment After the Alleged Onset Date

In January 2010, Gill completed a form regarding Plaintiff's mental functioning. (Tr. 291-94.) He identified symptoms of chronic pain, depression, anxiety, fatigue, insomnia, nightmares, memory loss, and lack of concentration. (Tr. 291.) His diagnoses: pain disorder and dysthymic disorder. (*Id.*) Gill opined that Plaintiff had "marked" limitations, which the form identifies as a "serious impairment to function independently (up to 75% [of the time])," in activities of daily living, maintaining social functioning, and concentration, persistence, or pace. (Tr. 292.) He did, however, qualify his findings: "ratings . . . based on experience [with] [patient] in therapy only—no knowledge of work-related function." (Tr. 292.) Nonetheless, Gill thought that Plaintiff could not

12

sustain full-time work "at this time." (Tr. 294.) He explained, "[patient] finds little relief from chronic pain—must lie prone for degree of relief. With emotional growth and greater clarity of [illegible] [and] development of greater pain coping skills [it] is anticipated leading hopefully to higher level of functioning." (*Id.*)

In June 2010, Gill authored a letter to Plaintiff's social-security attorney. Gill wrote: "The patient suffers from depression and chronic pain and continues to carry unresolved and often debilitating emotion[,] including guilt, anger and grief over the losses and abuse she has experienced." (Tr. 297.) He explained, however, that Plaintiff was making progress in therapy:

> Over the 7 months of therapy the patient has moved from being resistant and distrustful of therapy (and any discussion of her traumatic history) to a state that I would characterize as very motivated to gain clarity about her past. Recent progress in therapy for example, has led to an understanding by the patient that a powerless 6 [year old] child can not be responsible for her own sexual abuse. Beginning to find bits of freedom in new understandings of her past has led to a greater sense of hope and the desire to create change and find a more satisfying way to live. Despite some indication of greater awareness on the part of the patient[,] her prognosis remains guarded as the emotional damage she has sustained runs deep.

(Tr. 297.) Gill concluded, "I feel with continued therapy the patient will find more effective ways to protect herself from new emotional wounds and make greater progress on her path to healing." (Tr. 297.)

## C. Testimony at the Hearing Before the ALJ

### 1. Plaintiff's Testimony

At the July 2010 administrative hearing, ALJ Xenos asked Plaintiff to describe her "biggest or most serious condition." (Tr. 44.) Plaintiff responded, "chronic back pain and the leg pain." (Tr. 44.) She detailed that pain as follows: "I have constant chronic pain in my back that runs down my right leg. My right foot is always numb and I have muscle spasms in my leg and I get cramps, really

bad cramps in my right leg." (Tr. 41.) The pain, Plaintiff said, was typically at an eight- or nine-out-of-ten. (Tr. 46.) And medication did not fully relieve it:

> It helps to an extent. Not as good as I would like it to. My doctor did recommend that if the pain continued to get worse, for me to contact him and they could try the TENS unit. I haven't done that, yet. I have just been on the medication since my surgery. It alleviates some of the pain, but with the lying down and combination of lying down and the medication, that's when I get the best relief.

(Tr. 45.)

Plaintiff described limited daily activities and functioning. A long-time friend helped take care of her son. (Tr. 41.) Her boyfriend took care of the housework. (*Id.*) At times she would go grocery shopping—if it was "a short trip" limited to "a couple of things." (Tr. 42.) Otherwise, the long-time friend would help. (*Id.*) Plaintiff told the ALJ that 80 percent of her time was spent lying down. (*Id.*) But she read a lot, including to her son, and watched TV. (*Id.*) Plaintiff stated that she could walk only 15 minutes, stand for only 15 or 20 minutes, and sit for only 15 or 20 minutes. (Tr. 46-47.) Five pounds was the most Plaintiff thought that she could comfortably lift. (Tr. 47.)

Plaintiff testified only briefly about her mental or emotional impairments. (Tr. 47.) She told the ALJ that she had crying spells "two or three times" per week. (Tr. 45.)

### 2. The Vocational Expert's Testimony

ALJ Xenos also solicited testimony from a vocational expert to determine whether jobs would be available for someone with functional limitations she believed approximated Plaintiff's. The ALJ asked about job availability for a hypothetical individual of Plaintiff's age (37 on the alleged onset date), education (two years of college), and work experience who was capable of unskilled, routine work; standing or walking in combination for two of eight working hours; sitting for six of those eight; and "occasionally" climbing stairs, balancing, stooping, kneeling, crouching,

14

and crawling. (Tr. 49.) The individual was incapable, however, of climbing ladders; being exposed to hazards such as moving machinery and unprotected heights; and maintaining concentrated exposure to temperature extremes, wet and humid conditions, or vibration. (Tr. 49.) The vocational expert first noted that the sitting requirements were equivalent to a sit-stand option; she then testified that this individual could perform a number of jobs including packer, inspector checker, and office helper. (Tr. 49.) Each category, said the expert, had thousands of jobs in Michigan. (*Id.*)

The ALJ then asked the vocational expert about someone with these same restrictions but who was limited to lifting five pounds "frequently." (Tr. 50.) The vocational expert identified sorter, surveillance system monitor, and order clerk, each with over a thousand jobs in Michigan. (*Id.*)

## II. THE ALJ'S APPLICATION OF THE DISABILITY FRAMEWORK

Under the Social Security Act, disability insurance benefits and supplemental security income "are available only for those who have a 'disability.'" *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). The Act defines "disability," in relevant part, as the

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505 (DIB); 20 C.F.R. § 416.905 (SSI).

The Social Security regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> 1. If claimant is doing substantial gainful activity, he is not disabled.
>
> 2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.
>
> 3. If claimant is not doing substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least

twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. Even if claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that accommodates his residual functional capacity and vocational factors (age, education, skills, etc.), he is not disabled.

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997); *see also* 20 C.F.R. §§ 404.1520,

416.920. "The burden of proof is on the claimant throughout the first four steps . . . . If the analysis

reaches the fifth step without a finding that the claimant is not disabled, the burden transfers to the

[Commissioner]." *Preslar v. Sec'y of Health and Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

In applying this five-step framework, ALJ Xenos made the following findings. At step one,

she found that Plaintiff had not engaged in substantial gainful activity since the alleged disability

onset date of December 7, 2008. (Tr. 22.) At step two, she identified "spine disorder" as a severe

impairment. (*Id.*) Next, the ALJ concluded that this impairment did not meet or medically equal a

listed impairment. (Tr. 23-24.) Between steps three and four, the ALJ determined that Plaintiff had

the residual functional capacity to

> perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except the claimant requires unskilled routine work; can lift 5 pounds frequently; can stand/walk 2 hours in an 8-hour workday; can sit for 6 hours in an 8-hour workday; requires a sit/stand option; can occasionally climb stairs, balance, stoop, kneel, crouch, and crawl; cannot climb ladders; should avoid hazards, such as moving machinery and unprotected heights; and should avoid concentrated exposure to temperature extremes, wet and humid conditions, and vibration.

(Tr. 24.) At step four, the ALJ found that Plaintiff was unable to perform any past relevant work.

(Tr. 26.) At step five, the ALJ found that sufficient jobs existed in the national economy for someone

of Plaintiff's age, education, work experience, and residual functional capacity. (Tr. 27.) The ALJ

16

therefore concluded that Plaintiff was not disabled as defined by the Social Security Act from the alleged onset date through the date of her August 27, 2010 decision. (Tr. 28.)

## III. STANDARD OF REVIEW

This Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited: the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal quotation marks omitted).

Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted); *see also Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc) (noting that the substantial evidence standard "presupposes . . . a zone of choice within which the decisionmakers can go either way, without interference by the courts" (internal quotation marks omitted)).

When reviewing the Commissioner's factual findings for substantial evidence, the Court is limited to an examination of the record and must consider that record as a whole. *Bass v. McMahon*, 499 F.3d 506, 512-13 (6th Cir. 2007); *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683

(6th Cir. 1992). The Court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006). Further, this Court does "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass*, 499 F.3d at 509; *Rogers*, 486 F.3d at 247.

## IV.  ANALYSIS

Plaintiff claims that the ALJ failed to appreciate the severity of her mental impairments, including wrongly discounting Gill's opinion. (Pl.'s Mot. Summ. J. at 16-17; *see also id.* at 23-24.) She also asserts that the ALJ's conclusion at step three, that her  impairments did not meet or medically equal a listed impairment, is not supported by substantial evidence. (Pl.'s Mot. Summ. J. at 18-19.) The Court does not find that either of these claims of error require remand. The Court does find, however, that the ALJ's credibility analysis is conclusory, and agrees with Plaintiff that remand is justified for the ALJ to consider all of the factors bearing on Plaintiff's credibility. (*See id.* at 19-21.) Accordingly, the Court begins with this claim of error.

### A. The ALJ's Credibility Analysis Is Incomplete

The ALJ's credibility analysis suffers from both substantive and procedural errors. Procedurally, the ALJ's too-brief explanation prevents this  Court from determining whether substantial evidence supports her credibility determination. In particular, the ALJ stated:

> The undersigned has considered the claimant's allegations and has found them inconsistent with the objective medical findings in the record. The claimant's testimony is not well supported by the objective medical evidence in the record and, while given appropriate consideration, it was not given significant weight.

(Tr. 26.) The above fails to identify which of Plaintiff's "allegations" were inconsistent with what

18

"objective medical findings." The Court has thoroughly summarized the medical evidence above. It cannot be that all of Plaintiff's testimony was contradicted by the objective evidence. Nor can it be that all the objective evidence contradicts Plaintiff's testimony. While the ALJ clearly thought that particular statements were contradicted by certain medical evidence (Tr. 26), it again would have been extremely helpful for her to have provided those thoughts when drafting her narrative. *See Stacey v. Comm'r of Soc. Sec.*, 451 F. App'x 517, 519 (6th Cir. 2011) (noting that an "ALJ's decision still must say enough 'to allow the appellate court to trace the path of his reasoning.'" (quoting *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995)); *Lowery v. Comm'r of Soc. Sec.*, 55 F. App'x 333, 339 (6th Cir. 2003) (noting that an "'ALJ may not select and discuss only that evidence that favors his ultimate conclusion, but must articulate, at some minimum level, his analysis of the evidence to allow the appellate court to trace the path of his reasoning.'" (quoting *Diaz*, 55 F.3d at 306)).

The Court recognizes that it has an obligation to defer to an ALJ's credibility determination. *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003). Still, this Court does not sit to rubber stamp that assessment; instead, it has the responsibility of determining whether substantial evidence supports it. *Id.* (providing that reviewing court determines whether the ALJ's explanation for discrediting a claimant's testimony is "reasonable and supported by substantial evidence in the record"). In discharging this important task, the Court must have some way to determine what in the record the ALJ believed was inconsistent with which parts of the claimant's testimony. The Commissioner's own rulings recognize as much. *See* S.S.R. 96-7p, 1996 WL 374186, at *5 ("The [credibility] determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the

individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.").

Turning to the substance, even if the ALJ's statement, "[t]he claimant's testimony is not well supported by the objective medical evidence in the record" (Tr. 26), is somehow deemed "sufficiently specific to make clear" the reasons she discounted Plaintiff's testimony, *see* S.S.R. 96-7p, the governing regulations provide that an ALJ is not to reject a claimant's allegations of pain solely because they are not corroborated by objective evidence. *See* 20 C.F.R. § 404.1529(c)(2) (providing that an ALJ must not reject a claimant's "statements about the intensity and persistence of [his] pain or other symptoms or about the effect [his] symptoms have on [his] ability to work solely because the available objective medical evidence does not substantiate [the claimant's] statements."); *see also Jones*, 336 F.3d at 475 ("There is no question that subjective complaints of a claimant can support a claim for disability, if there is also objective medical evidence of an underlying medical condition in the record."). To the contrary, an ALJ is to consider the following non-exhaustive list of factors: (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of the claimant's pain or other symptoms; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication the claimant takes to alleviate pain or other symptoms; (5) treatment, other than medication, the claimant received for relief of pain or other symptoms; (6) any measures the claimant used to relieve pain or other symptoms; and (7) other factors concerning functional limitations and restrictions due to pain or other symptoms.  20 C.F.R. § 404.1529(c)(3).

In this case, many of these non-objective factors favor crediting Plaintiff's testimony. Plaintiff has undergone three spinal surgeries (Tr. 213, 228, 443), but she continues to have

considerable pain. The record indicates that Plaintiff has a long history of being prescribed strong pain medication, for example, Methadone, MS Contin, and Percocet, but these medications, even after Plaintiff's latest surgery, do not resolve her pain. (Tr. 312, 344, 345, 350-51, 362.) Indeed, Plaintiff resorted to marijuana to help lessen her pain. (Tr. 312.) Plaintiff also twice tried injections, which did not work. (Tr. 350, 412.) Notably, it appears that the ALJ overlooked Plaintiff's testimony about the ineffectiveness of the May 2010 injections. (*Compare* Tr. 25 ("Dr. Pompy recommended epidural steroid injections for the claimant's back pain. There is no indication in Dr. Pompy's records the claimant followed through with this recommendation."), *with* Tr. 45 ("I had [the nerve block] done on a Tuesday and then he wanted me to come back on a Thursday . . . to have another one done and I called and told him that it just made me worse. That I didn't want to do that again.").) Indeed, as a seeming last resort, an implantable stimulation unit has been considered to treat Plaintiff's pain. (*See* Tr. 344 ("[T]here does not appear to be anything further we can recommend for [her]. If she fails all conservative efforts then the dorsal column stimulator may be indicated.").) Further still, psychological factors are thought to make Plaintiff's ability to manage her pain more difficult. (Tr. 359.)

The Commissioner points out that the ALJ considered one non-objective-medical evidence factor in support of her credibility analysis: Plaintiff's activities of daily living. (Def.'s Mot. Summ. J. at 14.) But this factor supports, rather than discounts, Plaintiff's testimony. The ALJ noted that Plaintiff attended church and drove occasionally. (Tr. 25.) This is true, but Plaintiff's full testimony on this point suggests that her driving was quite limited: "I [drive] on occasion, only basically for doctor office visits, picking up prescriptions. My boyfriend picks them up a lot for me if I can't. Just short trips. This trip here was pretty hard. . . . [I]t took me a good 45-minutes to get here." (Tr. 41.)

The ALJ also pointed to Plaintiff's ability to cross stitch. (Tr. 25.) It is not clear how this is inconsistent with Plaintiff's testimony that "I don't really do anything. I would say 80 percent of my time is spent lying down. That's when I have the most relief from my pain." (Tr. 42.) A fairer summary of Plaintiff's activities of daily living is this:

> I have a hard time just doing day-to-day activities. I do have to get assistance from my girlfriend who I have known since Junior high. She helps me with my son. I have a hard time just doing basic things, housework, and things like that. My boyfriend does all of the housework. I have a constant chronic pain in my back that runs down my right leg. My right foot is always numb and I have muscle spasms in my leg and I get cramps, really bad cramps in my right leg.

(Tr. 41.)

In short, the ALJ's conclusory credibility analysis leads the Court to conclude that she focused too heavily on the absence of objective medical evidence. And this was harmful error in view of the other factors supporting Plaintiff's testimony, including those just recounted. Remand, therefore, is warranted.

Although the Court may well end its analysis here, providing its opinion on the ALJ's analysis of Plaintiff's mental impairments will hopefully streamline proceedings on remand (should the District Judge agree with the recommendation).

### B. Plaintiff's Claims of Error Regarding Her Mental Impairments Do Not Justify Remand

Plaintiff argues generally about the ALJ's failure to recognize her dysthymic disorder as a "severe" impairment, and specifically asserts that the ALJ's step-two finding that she had only "mild" limitations in activities of daily living was not supported by substantial evidence. (Pl.'s Mot. Summ. J. at 16.) There is some merit to this argument. Step two is not a high hurdle for a claimant to clear: "[A]n impairment can be considered not severe only if it is a slight abnormality that

minimally affects work ability regardless of age, education, and experience." *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988); *see also Despins v. Comm'r of Soc. Sec.*, 257 F. App'x 923, 929 (6th Cir. 2007). Here, Plaintiff has been diagnosed with post traumatic stress disorder and has required at least one extended period of mental-health treatment consisting of both therapy and medication. (Tr. 250-91.) Accordingly, the Court will assume, without deciding, that the ALJ erred in concluding that Plaintiff's dysthymic disorder had only a minimal effect on her ability to work during the disability period.

It remains, however, that an ALJ's error in excluding an impairment as "severe" at step two is not harmful so long as the ALJ finds another severe impairment, continues with the five-step analysis, and accounts for all impairments, both severe and non-severe, at the subsequent analytical steps. *See Swartz v. Barnhart*, 188 F. App'x 361, 368 (6th Cir. 2006); *Riepen v. Comm'r of Soc. Sec.*, 198 F. App'x 414, 415 (6th Cir. 2006).

Plaintiff has not argued harmful error at step three. Although asserting that the ALJ did not account for her dysthymic disorder in determining whether she met or equaled the Commissioner's listing for *spinal disorders*, Plaintiff makes no claim that her post-traumatic stress disorder, panic disorder, or dysthymic disorder met or equaled any mental-impairment listing. (*See* Pl.'s Mot. Summ. J. at 18-19.) As such, the Court turns to the ALJ's residual functional capacity assessment. (Plaintiff's spinal-disorder claim will be addressed separately below.)

Between steps three and four, the ALJ assessed Plaintiff's mental residual functional capacity as sufficient to perform "unskilled routine" work. (Tr. 24.) Plaintiff says that this was error because it did not "accurately portray" her mental limitations. (Pl.'s Mot. Summ. J. at 24.) More specifically, Plaintiff claims that the ALJ erred in discounting the opinion of her therapist, David Gill. (Pl.'s Mot.

23

Summ. J. at 21-24.) Gill found that Plaintiff had "marked" limitations in activities of daily living, maintaining social functioning, and concentration, persistence, or pace—limitations that are, according to Plaintiff, inconsistent with even "unskilled," "routine" work. (Tr. 292.)

The Court finds that the ALJ did not reversibly err in discounting Gill's opinion. First, it appears that Gill's opinion was not a "medical opinion" as that term is used in the Social Security regulations. Gill was a limited licensed psychologist. (Tr. 296, 298.) Although the Social Security regulations provide that "[l]icensed or certified psychologists" are "acceptable medical source[s]," they do not classify limited licensed psychologists. *See* 20 C.F.R. § 404.1513(2). At least one court in this District has held that a limited licensed psychologist is not an acceptable medical source. *See Madajski v. Comm'r of Soc. Sec.*, No. 12-10656, 2013 WL 1212071, at *6 (E.D. Mich. Jan. 29, 2013) ("Mr. Leichner is a limited licensed psychologist consequently he is not an 'acceptable medical source.'"), *report and recommendation adopted*, 2013 WL 1211904 (E.D. Mich. Mar. 25, 2013). *Madajski*'s conclusion seems reasonable in view of the fact that medical professionals seemingly analogous to a limited licensed psychologist—"nurse-practitioners, physicians' assistants, . . . and therapists," 20 C.F.R. § 404.1513(d)(1), and "licensed clinical social workers," S.S.R. 06-03p, 2006 WL 2329939, at *3—are not "acceptable medical sources." Because Gill was not an "acceptable medical source," he could not author a "medical opinion." S.S.R. 06-03p, 2006 WL 2329939 at *2; 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2).

This conclusion undermines Plaintiff's argument. Plaintiff relies on the treating-source rule, *see Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541 (6th Cir. 2004), to claim that "[d]eference should have been given to the opinion of David Gill, the treating psychologist, relative to [T.W.'s] mental impairment." (Pl.'s Mot. Summ. J. at 23-24.) But reliance on the treating-source rule is misplaced

24

because only an "acceptable medical source" may qualify as a treating source. S.S.R. 06-03p, 2006 WL 2329939 at *2 ("[O]nly 'acceptable medical sources' can give us medical opinions. . . . [O]nly 'acceptable medical sources' can be considered treating sources, as defined in 20 CFR 404.1502 and 416.902, whose medical opinions may be entitled to controlling weight.").

Second, it was reasonable for the ALJ to discount Gill's opinion in view of Gill's own qualification. Although finding that Plaintiff had "marked" limitations in activities of daily living, social functioning, and concentration, persistence, or pace, Gill made explicit that his ratings were based only on his experience with Plaintiff during therapy; he had "no knowledge of work-related function." (Tr. 292.) Gill thus offered no opinion on Plaintiff's ability to perform work-related tasks or function within a work environment. Yet this was the consideration before the ALJ between steps three and four. *See* S.S.R. 96-8p, 1996 WL 374184 at *1 ("[A residual functional capacity] is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis."). And to the extent that Gill opined that Plaintiff could not work, not only was the ALJ not required to give this legal determination special deference, *Turner v. Comm'r of Soc. Sec.*, 381 F. App'x 488 (6th Cir. 2010); *Brock v. Comm'r of Soc. Sec.*, 368 F. App'x 622, 625 (6th Cir. 2010), part of Gill's reasoning for his conclusion was beyond his expertise: "[patient] finds little relief from chronic pain—must lie prone for degree of relief," (Tr. 294).

Third, Plaintiff herself provided that her mental impairments were entirely consistent with the ALJ's residual functional capacity limitations of "unskilled routine work." On a self-completed function report, Plaintiff indicated that she did not have problems with memory, completing tasks, concentration, understanding, following instructions, or getting along with others. (Tr. 152.) Indeed,

25

she provided that she could pay attention "as long as needed" and follow spoken instructions "well." (Tr. 152.) She also stated that she got along "well" with authority figures and handled changes in routine "O.K." (Tr. 153.) The demands of unskilled work require nothing more than what Plaintiff reported she could do. *See Latarte v. Comm'r of Soc. Sec.*, No. 08-13022, 2009 WL 1044836, at *3 (E.D. Mich. Apr. 20, 2009) ("Unskilled work, by definition, is limited to understanding, remembering and carrying out only simple instructions and requiring little, if any, judgment." (citing 20 C.F.R. § 404.1568(a))).

In short, the Court believes that Plaintiff has not shown that the ALJ's failure to find that her dysthymic disorder was a severe impairment at step two resulted in harmful error at subsequent steps of the five-step analysis. Regarding step three, Plaintiff has not argued that her mental or emotional condition meets or equals a mental-impairment listing. Between steps three and four, the record supports the ALJ's conclusion that Plaintiff's mental impairments do not preclude "unskilled," "routine" work. As such, even if the ALJ erred at step two regarding Plaintiff's mental impairments, Plaintiff has not shown that the ALJ's mental residual functional capacity assessment lacks substantial evidentiary support.

### C. The ALJ's Step-Three Analysis, While Conclusory, Does Not Require Remand

Plaintiff also argues that the ALJ erred at step three in finding that her spinal disorder (failed laminectomy syndrome, epidural fibrosis, L4, L5, S1 radiculopathy, and neuropathic pain syndrome (*see* Tr. 412)), did not meet or equal the "Disorders of the Spine" listing found at 20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 1.04. In reaching her step-three conclusion, the ALJ reasoned as follows:

> Although the claimant has the severe impairment [of a spine disorder], the impairment does not meet or medically equal the specific criteria of 1.00 Musculoskeletal Systems, or any impairment listed in Appendix 1, Subpart P, Regulations No. 4. The medical opinion of the State agency and consultative

26

physicians, all of whom considered the relevant Listings, support this finding.

(Tr. 24.) Plaintiff asserts that this analysis fails to adequately explain why Listing 1.04 was not met

or equaled. (Pl.'s Mot. Summ. J. at 18.)

The Court agrees that the above analysis is conclusory. Listings often require a claimant to

satisfy many "elements." For example, the listing at issue in this case, Listing 1.04, requires Plaintiff

to show that her spinal problems met or medically equaled each of the following elements:

> [1] Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis,
> spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral
> fracture), [2] resulting in compromise of a nerve root (including the cauda equina)
> or the spinal cord. With:

> [3] Evidence of nerve root compression characterized by [3a] neuro-anatomic
> distribution of pain, [3b] limitation of motion of the spine, [3c] motor loss (atrophy
> with associated muscle weakness or muscle weakness) [3d] accompanied by sensory
> or reflex loss and, if there is involvement of the lower back, [3e] positive straight-leg
> raising test (sitting and supine);

20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 1.04A. The ALJ's statement that Plaintiff's spinal disorder

did "not meet or medically equal the specific criteria of l.00 Musculoskeletal Systems or any

impairment listed in Appendix 1, Subpart P, Regulations No. 4" (Tr. 24), fails to identify which of

these elements were not met or medically equaled, and why.

When an ALJ paints with such a broad brush, it often leaves an onerous task for a reviewing

court. *See e.g.*, *Andrews v. Comm'r of Soc. Sec.*, No. 12-13111, 2013 WL 2200393, at *11-12 (E.D.

Mich. May 20, 2013); *Bolla v. Comm'r of Soc. Sec.*, No. 11-11008, 2012 WL 884820, at *6-7 (E.D.

Mich. Feb. 3, 2012), *report and recommendation adopted*, 2012 WL 882780 (E.D. Mich. Mar. 15,

2012); *M.G. v. Comm'r of Soc. Sec.*, 861 F. Supp. 2d 846, 858 (E.D. Mich. 2012) (Michelson, M.J.)

("When faced with similarly conclusory meets or medically equals analysis, courts have found that

the ALJ's narrative deprives the federal court of its ability to act as an appellate tribunal and instead

27

forces the court to become the finder of fact."). Without any hint from the ALJ as to which elements she thought were unmet or unequaled, and where no element stands out as unsatisfied, the court must proceed to consider all the evidence for and against the satisfaction of a number of elements. But ALJs, in reaching their ultimate meets or medically equals conclusion, have presumably thought through this elemental analysis. By writing down their thoughts, they would greatly aid reviewing courts: once certain elements are identified as unmet or unequaled, a federal court may then determine whether substantial evidence supports the ALJ's findings regarding those particular elements.

This is not to say that this type of explanatory deficiency, without more, always requires remand. *See M.G.*, 861 F. Supp. 2d at 860 (reasoning that an ALJ's failure to adequately articulate his analysis at step three could be harmless error). Here, it is plain that Plaintiff's spinal problems do not meet at least one element of Listing 1.04A: "motor loss (atrophy with associated muscle weakness or muscle weakness)." True, in August 2009, Dr. Brummett found that Plaintiff had "4 out of 5 weakness" in her ability to flex and extend her right leg at the knee. And in May 2010, Dr. Pompy noted that Plaintiff's foot inversion and eversion was "weak." But in January, February, and in March 2009, Plaintiff had virtually full strength in her lower extremities (Tr. 187, 364, 427); in June 2009, Plaintiff's muscle strength was five out of five in her lower extremities (Tr. 360); in July 2009, she had full strength in her lower extremities except for a muscle that extends her right, big toe (Tr. 446); October 2009: Plaintiff's muscle strength was five-out-of-five on the right and her sensation was intact (Tr. 344); and in April 2010 she had normal sensory and motor function in her legs (Tr. 305). In other words, the record strongly suggests that Plaintiff did not suffer from "atrophy with associated muscle weakness or muscle weakness" commensurate, in terms of both severity and

duration, with a finding that she met that element of Listing 1.04A. *See* 20 C.F.R. § 404.1520(a)(4)(iii) ("If you have an impairment(s) that meets or equals one of our listings in appendix 1 of this subpart and meets the duration requirement, we will find that you are disabled.").

As for the other half of the step-three analysis, Plaintiff also has not persuaded the Court that the record justifies remanding for further inquiry on whether she medically equals Listing 1.04A. On remand, Plaintiff would have the "burden to prove" that her impairments medically equal that listing, *Lusk v. Comm'r Soc. Sec.*, 106 F. App'x 405, 411 (6th Cir. 2004), and to carry that burden, she would have to produce evidence of symptoms or diagnoses equal in severity and duration "to *all* the criteria" of Listing 1.04A, *Daniels v. Comm'r Soc. Sec.*, 70 F. App'x 868, 874 (6th Cir. 2003).

In an attempt to show that she could carry this burden on remand, Plaintiff cites Dr. Halpern's statement that "[psychological] factors play a role in [Plaintiff's] pain symptoms." (Pl.'s Mot. Summ. J. at 19.) But it cannot be that this broad statement suffices to medically equal the specific atrophy and muscle weakness element of Listing 1.04A. Plaintiff also lists, without much explanation, numerous pages from the record. (Pl.'s Mot. Summ. J. at 18-19.) The Court has reviewed what Plaintiff cites and it does not appear—to a lay person at least—that those records indicate conditions that medically equal "motor loss (atrophy with associated muscle weakness or muscle weakness)."

On this last point, it is notable that the administrative record contains a Disability Determination and Transmittal Form, signed by Dr. Rosch, the consultative physician who reviewed Plaintiff's records in April 2009, indicating that Plaintiff is not disabled. (Tr. 53.) The Commissioner's rulings provide that this form, when signed by a physician, constitutes an opinion

from a medical expert on the issue of medical equivalence. S.S.R. 96-6p, 1996 WL 374180, at *4 ("The signature of a State agency medical or psychological consultant on an SSA-831-U5 (Disability Determination and Transmittal Form) . . . ensures that consideration by a physician (or psychologist) designated by the Commissioner has been given to the question of medical equivalence at the initial and reconsideration levels of administrative review."). Taking all of this together then, Plaintiff has not persuaded this Court that there is a reasonable probability that, on remand, she could prove that her impairments medically equal Listing 1.04A.

In sum, the Court agrees with Plaintiff that the ALJ provided a conclusory step-three analysis. But the Court disagrees with Plaintiff that remand is necessary for the ALJ to revisit her step-three conclusion.

## V. CONCLUSION AND RECOMMENDATION

For the reasons provided, this Court believes that the ALJ did not adequately articulate her credibility analysis or consider all the relevant factors bearing on Plaintiff's credibility. As such, and for reasons set forth below, the Court RECOMMENDS that Plaintiff's Motion for Summary Judgment (Dkt. 12) be GRANTED IN PART, that Defendant's Motion for Summary Judgment (Dkt. 15) be DENIED, and that, pursuant to 42 U.S.C. § 405(g), the decision of the Commissioner of Social Security be REMANDED.

## VI. FILING OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596 (6th Cir. 2006); *United States*

*v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *McClanahan v. Comm'r Soc. Sec.*, 474 F.3d 830, 837 (6th Cir. 2006); *Frontier*, 454 F.3d at 596-97. Objections are to be filed through the Case Management/Electronic Case Filing (CM/ECF) system or, if an appropriate exception applies, through the Clerk's Office. *See* E.D. Mich. LR 5.1. A copy of any objections is to be served upon this magistrate judge but this does not constitute filing. *See* E.D. Mich. LR 72.1(d)(2). Once an objection is filed, a response is due within fourteen (14) days of service, and a reply brief may be filed within seven (7) days of service of the response. E.D. Mich. LR 72.1(d)(3), (4).

s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES MAGISTRATE JUDGE

Dated:  July 22, 2013

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing document was served on the attorneys and/or parties of record by electronic means or U.S. Mail on July 22, 2013.

s/Jane Johnson
Deputy Clerk

31